UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-412-F

| | |
|---|---|
| NARENDRA MAVILLA; and<br>PADMAVATHI MAVILLA,<br>        Plaintiffs,<br><br>v.<br><br>ABSOLUTE COLLECTION SERVICE,<br>INC.; and WAKEMED FACULTY<br>PHYSICIANS,<br>        Defendants. | <u>O R D E R</u> |

This matter is before the court on Motion to Set Aside Entry of Default [DE-23] filed by defendant Absolute Collection Service ("ACS"). The plaintiffs have responded in opposition [DE-27] to that motion. Also pending are plaintiffs' Motion for Default Judgment [DE-11] and Motion for Hearing [DE-14].[1] The plaintiffs have dismissed this action against WakeMed Faculty Physicians ("WakeMed").

COMPLAINT'S FACTUAL ALLEGATIONS

The gravamen of plaintiffs' Complaint [DE-1] is as follows. Plaintiff Padmavathi Mavilla was living in California in 2001 when she underwent a voluntary sterilization procedure. She moved to North Carolina in 2003. Between April and November 2009, ACS on behalf of WakeMed, tried to collect for pre-natal and obstetric services rendered at WakeMed in June 2005 and July 2006, and billed on account(s) listed in Ms. Mavilla's name at her address in Raleigh, North Carolina.

Ms. Mavilla contends she could not possibly owe these sums because she was physically incapable of needing that type of medical care in 2005, following her surgery in 2001, and had never set foot in North Carolina until 2003. She alleges that she wrote WakeMed and ACS

---

[1] These motions were held in abeyance by order of April 26, 2011 [DE-28].

explaining the situation and requesting they stop demanding that she pay debts she did not incur. She contends the "harassment" continued through telephone calls and culminated in ACS's falsely reporting to the three national credit reporting agencies that she was delinquent as to these three accounts, resulting in reduction of her credit score, which in turn caused her to be denied a low-interest-rate mortgage application. She seeks more than a million dollars in actual, statutory and punitive damages against ACS, together with attorney's fees and costs incurred, as well as a declaratory judgment "that she owes Defendants nothing."

PROCEDURAL BACKGROUND

On October 4, 2010, the plaintiffs[2] filed an unverified Complaint against ACS and WakeMed seeking a declaratory judgment, actual, punitive, and statutory damages, attorney's fees, and costs for alleged violations of several federal and state consumer credit laws. On December 21, 2010, on plaintiffs' motion [DE-8], the Clerk filed an Entry of Default [DE-9] against ACS. During the week of January 10, 2011, plaintiffs moved for Default Judgment, *see* [DE-10], and filed a Supplement [DE-12] to the Motion for Default Judgment, a consent to Magistrate Judge jurisdiction [DE-13], a Motion for Hearing on Motion for Default Judgment [DE-14], and a voluntary dismissal of this action as against defendant WakeMed [DE-16].

Before deciding whether or not to conduct a hearing, the undersigned directed plaintiffs' counsel, Christopher Livingston ("Livingston") to file documentation and affidavits supporting his request for default judgment, damages, attorneys' fees and costs. In response, Livingston filed a memorandum [DE-18] in which he proposed an award of $1,161,895.00, plus declaratory relief for his clients, and attached his affidavit reflecting the basis for his fee request for $3,500.00.

---

[2] The Complaint does not specify the relationship, if any, between the plaintiffs; in fact, the only mention of "Mr. Mavilla" in the Complaint is in ¶ 39, wherein Mr. Mavilla is alleged to have been damaged "because he is liable for paying mortgage interest."

2

As the court was considering Livingston's response [DE-18] and purported documentation, ACS filed a Notice of Appearance of Counsel [DE-22] and Motion to Set Aside Entry of Default [DE-23], supported by the affidavits of ACS counsel, Kenneth D. Perkins ("Perkins") and ACS Chief Operating Officer Christopher B. Malmfelt ("Malmfelt"). According to those sworn statements on behalf of ACS, the following events occurred.[3]

ACS, in fact, had been served with process through its registered agent on October 8, 2010. ACS's general counsel, Perkins, was notified of the lawsuit on October 12, 2010. Perkins avers that he contacted Livingston seeking an extension of time within which to respond to the Complaint. The court takes judicial notice that such practice is common and accepted in North Carolina's state courts. However, Perkins contends here that he sought, and Livingston agreed to, an "unlimited extension of time to respond to the Summons and Complaint. Livingston agreed that ACS could have as much time as it needed to respond to the Complaint." Perkins Affidavit, [DE-23], Attachment 1 at ¶ 6. Relying on Livingston's alleged acquiescence, Perkins filed neither a notice of appearance nor a response to the Complaint during the time required by the Federal Rules of Civil Procedure.

Perkins did, however, initiate an inquiry with WakeMed concerning the alleged factual basis of plaintiffs' lawsuit. WakeMed then discovered that its erroneous attribution of certain medical charges to Ms. Mavilla had resulted in referral of the matter to ACS for collection. When ACS learned of WakeMed's mistake, it "immediately removed the credit reporting from the Plaintiff's [sic] credit agency files." *Id.* at ¶ 7. Although the date on which the mistake was discovered and rectified is not contained in the affidavits, the record reflects that the plaintiffs filed a Voluntary Dismissal [DE-16] of this action against WakeMed on January 14, 2011.

---

[3] This account of the post-service events is paraphrased from ACS's Memorandum [DE-26] filed in support of its Motion to Set Aside Entry of Default [DE-23] and the affidavits attached thereto.

3

Perkins avers that a chance review of computerized case filings on April 20, 2011, revealed that the plaintiffs had obtained Entry of Default against ACS in this matter. Perkins states that he telephoned Livingston asking why Livingston had not served any paperwork or notice of the request for and entry of default, and that Livingston responded that he had no obligation to do so. Livingston also refused to agree to set aside the entry of default.

ACS filed a Notice of Appearance of counsel in this case on the same day it discovered entry of default, *see* [DE-22]. The following day, it filed a Motion to Set Aside Entry of Default [DE-23], supported by a memorandum [DE-26]. Livingston filed a timely Response [DE-27] in opposition to ACS's motion, in which he essentially accused Perkins of perjury with regard to the purported verbal agreement extending ACS's response time. Livingston's Affidavit, appended as Attachment 2 to his Response [DE-27], contains the following:

> 5. Ken Perkins did indeed telephone me at my cell number . . . on or about 28 October 2010, and asked for an extension of time to answer the Mavillas' lawsuit, which I readily agreed to as I always do for any defendant when asked in similar circumstances.
>
> 6. However, said extension was for 30 days, not "unlimited." I have no idea where Mr. Perkins got that notion, especially claiming that it 'was not predicated on good faith settlement discussions.' He certainly did not ask for an unlimited extension, because if he had, I would have declined, and would have inquired as to whether he was feeling all right.
>
> 7. What I **might** have said, as I often do, was that I would not default him so long as we were talking settlement, but if I did say so, then I would have added that settlement would not be cheap, because ACS badly hurt the Mavillas for no reason other than petty greed.
>
> . . . . .
>
> 9. I would not ever grant a defendant, especially a merciless bill collector who would never reciprocate if a consumer asked for the same relief after being sued on a debt, an unlimited extension of time to answer a lawsuit, nor can I imagine how a sophisticated corporate counsel could say with a straight face (and under penalty of perjury) that he seriously believed he could disregard a properly served federal lawsuit for as long as he totally felt like it without ever being defaulted.

*Id.* (emphasis in original).

4

Livingston's Affidavit continues in the same vein for 25 paragraphs, directing gratuitous scurrilous remarks at ACS and its counsel and concluding, *inter alia*, "I cannot recall [Perkins] mentioning anything about a supposed indefinite extension, and I believe he simply made that up after he realized the trouble he was in." ACS did not file a Reply to the plaintiffs' Response and was not required to do so. The court here makes reference to all of the plaintiffs' actual filings of record for a more complete overview of their legal posture.

ANALYSIS

Rule 55(c), Federal Rules of Civil Procedure, authorizes a district court to set aside an entry of default "for good cause."

> When deciding whether to set aside an entry of default, a district court should consider whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory action, and the availability of sanctions less drastic.

*Colleton Prep. Academy, Inc. v. Hoover Universal*, 616 F.3d 413, 417 (4th Cir. 2010) (quoting *Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 203 (4th Cir. 2006)). The Fourth Circuit has "repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." *Id.* (citing *Tazco, Inc. v. Director, Office of Workers Comp. Program, U.S. Dept. of Labor*, 895 F.2d 949, 950 (4th Cir. 1990)).

A. <u>Meritorious Defense & Reasonable Promptness</u>

There does not appear to be any question that ACS's involvement in this matter was as a retained debt collector for WakeMed. ACS contacted the plaintiffs because its client, WakeMed, had referred an alleged debt for collection. Plaintiffs do not contend that ACS initiated its efforts to collect a debt from Ms. Mavilla out of thin air; the information was relayed to it by Wake Med. Here, ACS contends it has a meritorious defense to the Complaint in that, until notified by WakeMed, ACS did not know that *WakeMed had made an error* in attributing the

5

contested debt to Ms. Mavilla. According to ACS, as soon as WakeMed alerted ACS to the mistake, ACS "immediately removed the credit reporting from the Plaintiff's credit agency files." Perkins' Affidavit [DE-23], Attachment 1. ACS also "claims defenses of bona fide error under the FDCPA, contributory negligence by Plaintiffs, and failure to mitigate damages by Plaintiffs, among other standard defenses." Memorandum [DE-26] at p. 3.

Plaintiffs contend ACS failed to act with appropriate diligence and promptness in recognizing its responsibility to respond to the Complaint. However, the court observes that an error was made by the court when, on December 14, 2010, the Clerk prematurely issued a "Notice to Plaintiff of Failure to Make Service Within 120 Days," [DE-6].[4] Livingston's affidavit, filed on December 14, 2010, demonstrates service of process on ACS was had on October 8, 2010. *See* Affidavit of Service [DE-7]. Livingston had not, however, filed proof of service or moved for entry of default before issuance of the Clerk's Notice mid-December 2010. The Clerk's miscalculated Notice would not have been necessary at all had plaintiffs filed their proof of service of process when they received it, then diligently sought entry of default, if appropriate.[5] The record reflects that ACS's counsel acted immediately upon learning that plaintiffs had obtained an entry of default.

B. Personal Responsibility of ACS

ACS's attorney, Kenneth Perkins, has stated under oath that he was responsible for failing to file an Answer to the Complaint, although he contends he did so in good faith. Perkins

---

[4] As the Complaint was filed on October 4, 2010, the 120-day time limit for service pursuant to FED. R. CIV. P. 4(m), in fact, did not expire until February 2, 2011.

[5] Livingston does not deny that he agreed to Perkins' request for an extension of time to Answer. He does not reveal, however, how much of an extension he purportedly agreed to honor. Livingston's December 14, 2010, Affidavit of Service [DE-7] and Motion for Entry of Default [DE-8] appear to have been triggered by the Clerk's premature Notice [DE-6] filed the same day.

6

avers that he believed Livingston had agreed to an "unlimited extension of time to respond to the Summons and Complaint." Perkins Affidavit, [DE-23], Attachment 1. Perkins denies that he and Livingston were engaged in settlement discussions when he requested consent for the extension. *Id.*

While verbal extensions of filing deadlines among counsel may be *de rigueur* in state court, it is not permitted in this federal court. The rules of this court provide:

> **Motion for an Extension of Time to Perform an Act**. All motions for an extension of time to perform an act required or allowed to be done within a specified time must show good cause, prior consultation with opposing counsel and the views of opposing counsel. The motion must be accompanied by a separate proposed order granting the motion.

LOCAL CIVIL RULE 6.1 (E.D.N.C.). Although Livingston now chides Perkins for his mistake, it does not appear that Livingston attempted to correct it at the time. While defense counsel certainly should have known better, there is no suggestion that the misunderstanding is attributable to his client, ACS.

Plaintiffs' assertion that they "have proved liability and damages beyond any reasonable doubt with specific documents and sworn affidavits" is mistaken. There has been no ruling on their motion for default judgment.

C. Prejudice to the Party

Livingston admits in his Response to the Motion to Set Aside Entry of Default that "[i]t is true that Plaintiffs suffer no prejudice from having to prove their case." Response [DE-27] at p. 6. They will have the opportunity to do so.

D. History of Dilatory Action

The plaintiffs have attached to their Response [DE-27] as "Exhibit 17, Still More Default Judgments and Motion to Reopen Case Against ACS," copies of four default orders and a

7

motion to reopen in other cases from other courts.[6] Plaintiffs contend these documents prove that ACS makes a practice of ignoring lawsuits filed against it and ACS should not be excused from doing so here. Although ACS has been a party to a few actions in this district, none have been defaulted. ACS, through the affidavits of Messrs. Perkins and Malmfelt, explains that it sometimes has "purposefully defaulted" in order to minimize damages "and cap at low levels otherwise unreasonable attorney fees that are typically occasioned with FDCPA and similar cases." Perkins Affidavit, [DE-23], Attachment 1, at ¶ 16. No history of default has been demonstrated in this court.

E. Availability of Less Drastic Sanctions

Livingston opines that the suggestion, offered in an unpublished case, to award attorneys fees associated with motions for default judgment "would be perfectly futile here," because he contends ACS refuses to pay its own debts and judgments. *See* [DE-27] at p. 7. In the very next paragraph, however, Livingston nevertheless requests that "default judgment be entered in [his clients'] favor for $1,161,895 . . . and that in the alternative, ACS be required to pay Plaintiffs all their costs and attorney fees incurred to date as a sanction for its tardiness, on pain of default judgment if that sum is not paid within 14 days of such order." *Id.*

The court accepts Livingston's opinion that an award of attorney's fees "would be perfectly futile here." More importantly, however, the court does not deem defense counsel's neglect to have been so egregious under all the circumstances as to merit sanctions, particularly in view of the admitted lack of prejudice to the plaintiffs.

CONCLUSION

Having considered ACS's Motion to Set Aside Entry of Default [DE-23] and the supporting affidavits, together with the plaintiffs' Response [DE-27] and supporting exhibits, in

---

[6] Plaintiffs earlier had submitted a copy of an Entry of Default by the Clerk of U.S. District Court, Southern District of Ohio. *See* Attachment 4 to DE-18].

light of the court's familiarity with the allegations in this case, all applied to the controlling law under FED. R. CIV. P. 55(c), the court concludes that ACS has shown good cause to set aside the Clerk's Entry of Default [DE-9]. Therefore, ACS's Motion to Set Aside Entry of Default [DE-23] is ALLOWED, the Entry of Default [DE-9] is SET ASIDE. The plaintiffs' Motion for Default Judgment [DE-10] and for Hearing [DE-14] are DENIED, and the unilateral Consent to Magistrate Jurisdiction [DE-13] is STRICKEN.

ACS shall file its Answer or other appropriate responsive pleading within twenty-one (21) days of the filing date of this order. The Clerk of Court is DIRECTED to provide the parties with a fresh AO-85 "Notice, Consent, and Reference of Civil Action to a Magistrate Judge" for their convenience, and to continue management of this case according to the rules and procedures of this district.

SO ORDERED.

This, the 25th day of July, 2011.

*James C. Fox*
JAMES C. FOX
Senior United States District Judge