UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-412-F

| | | |
|---|---|---|
| NARENDRA MAVILLA; and | ) | |
| PADMAVATHI MAVILLA, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| ABSOLUTE COLLECTION SERVICE, | ) | |
| INC.; and WAKEMED FACULTY | ) | |
| PHYSICIANS, | ) | |
| Defendants. | ) | |

This matter is before the court for ruling on cross-motions for summary judgment.

Defendant, Absolute Collection Service (''ACS'')[1] filed its Motion for Summary Judgment [DE-

56] on July 30, 2012. The plaintiffs (collectively, "Mavillas") filed a Motion for Partial

Summary Judgment [DE-58] on the same date. Both motions have been fully briefed and are

ripe for disposition.

## I. Factual Background and Allegations

The short description of this litigation is as follows. WakeMed erroneously billed Mrs.

Mavilla for medical services.[2] According to the Mavillas, they notified WakeMed that the bills

---

[1]    The plaintiffs took a voluntary dismissal as against defendant WakeMed Faculty
Physicians on January 14, 2011. See [DE-16].

[2]    The medical services purportedly were rendered on June 13, 2005 ($126.00), June 30,
2005 ($54.00), and July 26, 2006 ($312.00). The Mavillas' pleadings discuss a 2003 statement,
but it does not appear those charges were part of ACS's collection efforts. Indeed, an itemized
WakeMed statement the Mavillas acknowledge they received in April 2009, reflects obstetrical
services rendered and charged to her account on June 4 and June 22, 2003. The statement further
reflects entries on December 11, 2003, stating, "REJ: Fee adjusted to max payable," following
two Medicaid payments for the June 2003 services. The court has not identified in any of the
"dunning letters" ACS sent to the Mavillas any reference to the 2003 charges. See also Mrs.

were not theirs. Some or all of the services for which Mrs. Mavilla was billed were obstetrical services that she did not receive. In fact, she had undergone a voluntary sterilization procedure some years earlier before moving to North Carolina.

When payment was not forthcoming, WakeMed referred the matter to ACS in early April 2009, and ACS in turn attempted to collect the alleged debt. The Mavillas made a number of attempts to convince WakeMed and ACS that they did not incur the bills. Within about a week of ACS's receipt of the account from WakeMed and ACS's commencement of collection efforts, Wake Med provided copies of itemized statements for the purported debts to both ACS and the Mavillas. See Answer [DE-31], ¶ 19; Plaintiffs' Memorandum in Support of their Motion for Partial Summary Judgment [DE-58], p. 4 (alleging that ACS forwarded the itemized WakeMed statements to the Mavillas). Those itemized statements for three obstetrical services, which the plaintiffs allege WakeMed "fabricated," see id. p. 4, bore Mrs. Mavilla's correctly-spelled full name and address. See Plaintiffs' Motion for Default Judgment [DE-10], Exh. 2 (labeled "WakeMed bills 2009-04-06")

According to the Complaint, the Mavillas received collection, or "dunning," letter(s) on two occasions. See Complaint [DE-1], ¶¶ 14, 15 & 19 (three letters on April 14, 2009); ¶ 22 (three letters on June 3, 2009). They allege that ACS "began telephoning Plaintiffs numerous times in or around April 2009." Id. at ¶ 13. During her deposition, Mrs. Mavilla recalled that beginning around mid-April 2009, ACS called her house "almost every day." P. Mavilla Dep. [DE-57.B], p. 30; but see ACS's call logs contained in Exh. 1 to Plaintiffs' Motion [DE-58]

---

Mavilla's letters to WakeMed dated July 21, 2009, and August 24, 2009. See Motion for Default Judgment [DE-10], Exh. 4.

("Exhibit 21: ABS Collection Notes"). Sometimes she talked to the ACS representative but frequently she did not pick up the telephone when her caller-id indicated the call was from ACS. See id., pp. 37-38.

Initially, the Mavillas attempted to resolve the billing mistake through WakeMed, but they always were told that the information concerning the debt was correct; ACS's responses were similarly unsatisfactory. See, e.g., id. p. 39 ("even [ACS] didn't willing to listen my conversation, they told, 'No, you have to pay for the WakeMed those things, these things,' so one time – well, not one time, many times, they threatened, 'So it will affect your credit score and all of those things.' ").[3] Mrs. Mavilla testified, however, that ACS never threatened to file a civil lawsuit to collect the money. Id. p. 40.

The Mavillas continued to dispute the charges with both WakeMed and ACS, but ACS's collection efforts continued until the Mavillas sent ACS a cease-communication letter on August 24, 2009, pursuant to 15 U.S.C. § 1692c(c). See Complaint [DE-1], p. 3 ¶ 26; Answer [DE-31], p. 4 ¶ 26; Exh. 4 to Motion for Default Judgment [DE-10]. After that date, no further collection letters are alleged to have been sent by ACS to the Mavillas, although the alleged debts remained unpaid.

At least by mid-November 2009, ACS's electronic interface software ("E-OSCAR") caused a report of the alleged delinquent accounts to be distributed to one or more of the credit

---

[3]     For the Mavillas, English is a second language. During Mrs. Mavilla's deposition, her husband was permitted frequently to act as interpreter. This lawsuit does *not* suggest, however, that language barriers contributed to the parties' misunderstandings.

reporting agencies[4] ("CRAs"), and the Mavillas were so notified by letter.[5]  On or about

December 28, 2009, the Mavillas "against their will" paid the two June 2005, bills ($54.00 and

$126.00), totaling $180.  Id., p. 6.  The plaintiffs do not allege they paid the $312.00 July 26,

2006, bill.

Nearly a year later, in September 2010, the Mavillas did three things: they applied for and

were denied a lower-interest loan to refinance their home, see Suppl. Memorandum to Motion for

Default Judgment [DE-12] Exh. 2 (JP Morgan Chase Bank denial letter bearing "Score Date of

09/22/2010"); they applied for and were denied a Kohl's credit card, see id., Exh. 1 (Kohl's

rejection letter dated 09/21/2010, referencing Experian credit report); and they purportedly

notified "the credit bureaus" that they disputed the WakeMed/ACS charges and tradeline(s)

associated therewith.  The actual date on which the Mavillas disputed the debt(s) with the CRA(s)

is not alleged in the Complaint, and the court has not been able to locate documentation of that

date within the record.  The Complaint alleges only,"Plaintiffs disputed the false tradelines with

the credit reporting agencies."  Id. ¶ 35.  The record does reveal that ACS received notice that the

---

[4]     The "Big Three" CRAs are Experian, TransUnion, and Equifax.  Because for
purposes of this pending motions it is immaterial *which* one or more of the CRAs was involved
in a particular transaction, the court often refers herein to "the CRA(s)."

[5]     The Complaint characterizes this November 17th letter as another "dunning" letter,
although it quotes the letter as stating, "in pertinent part[,] 'Your delinquent account with
WakeMed Faculty Practice has been reported to national credit bureaus as a result of your
unwillingness to settle this account.' " Complaint [DE-1], p. 4 ¶ 29.

4

debt(s) were in dispute from CRA Equifax on September 27, 2010. [6] See C. Mamfelt Dep. of March 13, 2012 [DE-57.C]. p. 58, ll. 22-23, & Dep. Exh. 21.

*Five (5) business days* later, the Mavillas, through counsel, initiated this lawsuit against both WakeMed and ACS, see Complaint [DE-1], filed October 4, 2010 – almost a year after they received notification that the disputed debts had been reported to the CRAs and after the Mavillas had paid two of the three disputed "fabricated" debts. That Complaint alleges the two dates of the dunning letters the Mavillas received from ACS in April and June 2009, see id. ¶¶ 14, 15, & 19, and the dates on which Mrs. Mavilla wrote to WakeMed and ACS disputing the debts, see id. ¶ 25, as well as the date of ACS's letter notifying her that the debt had been reported to the CRA(s), see id. ¶ 26.

Although the Complaint does not allege when or how it occurred, the Mavillas state in their Memorandum that "sometime after 04 October 2010," (the date on which the Complaint was filed,) WakeMed notified ACS that the subject debts did not belong to the Mavillas and ACS closed the account at the CRAs. *See* Memorandum [DE-59], p. 8 ¶ 42. For this "uncontested fact," the Mavillas again cite ACS's Christopher Mamfelt's deposition, p. 69, lines 3-6. In fact, there is *no* reference at that point in the transcript as to when WakeMed notified ACS of the

---

[6]    In their Memorandum [DE-59] supporting their Motion for Partial Summary Judgment, the plaintiffs state as an "undisputed fact" that "[o]n or about 26 September 2010, Plaintiffs disputed the ACS/WakeMed tradelines through the credit bureaus, who communicated the dispute to ACS through E-OSCAR, ACS's 'electronic interface that we have with the credit bureaus.' " Memorandum [DE-59], p. 7 ¶ 35. For this proposition, plaintiffs cite the March 13, 2012, deposition of ACS's Chief Operating Officer Christopher Mamfelt [DE-57.C]. p. 58, ll. 22-23. The transcript of that deposition reveals that Mamfelt was testifying from plaintiffs' Exhibit 21, referencing the date on which ACS employee "Vickie Garrett - RECEIVED DISPUTE VERIFICATION FROM E-OSCAR; VERIFIED AS REPORTED; PAID," which was on September 27, 2010. There is no mention of an alleged date on when the plaintiffs notified the CRA(s) that they disputed the debt/tradeline(s) at issue.

mistake – whether before or after the Complaint was filed. See Kenneth Perkins' Affidavit [DE-23], Attach. 1 (when WakeMed alerted ACS to the mistake, ACS "immediately removed the credit reporting from the Plaintiffs' credit agency files;" see also C. Mamfelt Dep. of June 14, 2012 [DE-57.D], pp. 19-20; 25 (CRA entries were deleted at WakeMed's request)). The Mavillas further contend that ACS and/or WakeMed wrongfully retained the $180 that they unwillingly paid in December 2009.[7]

Although on the face of the record, the plaintiffs' own filings undermine certain facts essential to a *prima facie* showing on the FDCA claim, the Mavillas seek about $300,000.00 in statutory, compensatory, and punitive damages, together with attorney's fees and costs against ACS for purported violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* (Count I); the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.* (Count IV); the North Carolina Collections Agency Act ("NCCAA"), N.C. GEN. STAT. §§ 58-70-95(3), 58-70-110(4) and 58-70-115(1) (Count III);[8] and for Declaratory Judgment (Count V) that

---

[7]   Mamfelt, testified during his second deposition that ACS did not keep any money it collected from the Mavillas. See C. Mamfelt Dep. of June 14, 2012 [DE-57.D], p. 30. Further, an exhibit appended to the Mavillas' Memorandum supporting their Motion for Default Judgment [DE-11], Exh. 3 (labeled by plaintiffs as "Exhibit 7, ACS Credit Reports Showing False Debt on EQ, TU, EX") bears the following notation in the Negative Accounts section concerning the $126.00 and $54.00 debts, "WakeMed Faculty Practice Paid Collection." The exhibit is undated but states, "balance date" as "01/2010" for each of the two $0 balance accounts.

[8]   Over the Mavillas' vehement opposition, ACS was permitted to file a supplement to its motion for summary judgment, adding as a ground for relief that the Mavillas' state law claims are preempted by federal law. See Order [DE-77]. It is unnecessary to reach the preemption argument.

6

Mrs. Mavilla owes ACS nothing. The Mavillas concede that they may not recover on their Count II claim under the North Carolina Debt Collection Act, and have voluntarily dismissed that count.[9]

## II. Standard of Review

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A fact is material if, under the applicable substantive law, it is essential to the proper disposition of the claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. See id.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In meeting that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim, but simply must point out to the court that the other party lacks evidence on an essential element of its claim. See id. at 325.

_____

[9]    The Mavillas also filed a state court action, Mavilla v. WakeMed Faculty Practice Plan, No. 12-CVS-802 (Wake County Superior Court), under N.C. GEN. STAT. § 75-50, et seq., (North Carolina Debt Collection Act) arising from these same facts, on January 17, 2012, while this action was pending. They had taken a voluntary dismissal of an identical state lawsuit a year earlier (2011) because they had failed to serve the proper WakeMed entity. That 2012 state action was dismissed following an August 1, 2012, summary judgment hearing. See Transcript of Hearing, [DE-63-2]; Order [DE-63-3].

7

Once the movant has met this initial burden, the burden of production then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The nonmoving party may not simply rest upon its allegations to satisfy its burden. See id. Rather, the nonmoving party must "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. FED. R. CIV. P. 56(e); see Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888-89 (1990); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 248. To do so, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. See FED. R. CIV. P. 56.

Finally, summary judgment no longer is regarded as a "disfavored procedural shortcut." Instead, summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' " Celotex, 477 U.S. at 327 (quoting FED. R. CIV. P. 1).

### III. Discussion and Analysis

ACS seeks summary judgment as to all claims contained in the Complaint. The Mavillas acknowledge that they cannot recover on Count II; as it was alleged as against WakeMed only and WakeMed has been dismissed as a defendant. The Mavillas seek partial summary judgment against ACS on Counts I, III, and IV,

> as to liability and [FCRA] minimum damages of $80,589 actual, $2,000 statutory for violating FDCPA, and $196,100 statutory for violating NCCAA, total at least $278,689.00 . . . , together with court filing fees of $800, costs of suit and attorney fees to be finalized later, and such other and further relief that this Court deems just and proper.

Plaintiffs' Memorandum [DE-59], p. 18.

8

A. Count I – Violations of the FCRA

1. *Statutory Scheme and Basic Legal Underpinning*

The complexity of the wording and the structure of the FCRA has been the subject of numerous court opinions, more than one of which has commented on the near impossibility of a consumer comprehending it unaided by an expert.

> Congress purportedly enacted [the FCRA] to protect consumers. Its stated purpose is to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). Yet cases like this one lead the Court to wonder how Congress could have possibly believed that the FCRA would carry out those functions. It is of little value to ordinary consumers, in part due to the fact that it is hopelessly complex—the statute is drafted in hyper-technical language and includes a sufficient number of internal cross-references to make even the most dedicated legal practitioner consider a change in career. But the FCRA's substance is even more troubling than its complex form. The statute includes numerous provisions that limit consumers' ability to enforce its mandates either by explicitly barring private actions or by imposing such burdensome procedural requirements that no layperson could possibly be expected to comply.

Burrell v. DFS Services, LLC, 753 F. Supp. 2d 438, 444 (D.N.J. 2010).

Nevertheless, "we begin with the understanding that Congress 'says in a statute what it means and means in a statute what it says there.' " Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) (internal quotations omitted). Where " 'the statute's language is plain, "the sole function of the courts" . . . is to enforce it according to its terms.' " Id. (internal citations omitted). The court, therefore, must assess the Mavillas' FCRA claims in keeping with the plain, albeit convoluted, terms of that statute.

The court deems it impractical to attempt explanation of the operation of this statutory scheme by quoting the Act itself. In light of its contorted structure, maddening cross-references,

and use of similar-sounding terms for entirely different concepts or entities, a narrative description is far more effective.

> a. External references

One of the more helpful opinions is that of Circuit Judge Karen Nelson Moore in <u>Boggio v. USAA Federal Savings Bank</u>, 696 F.3d 611 (6th Cir. 2012). Judge Moore's "III. FCRA Analysis" specifically is recommended for a background of the content and application of relevant portions of the FCRA. <u>See</u> <u>id</u>. at pp. 614-18. Also illuminating is Chi Chi Wu & Elizabeth DeArmond, FAIR CREDIT REPORTING (7th ed. 2011) (hereinafter "FAIR CREDIT REPORTING"), Ch. 6, *"Activities and Duties of Furnishers of Information*," and particularly § 6.10.1.1 & § 6.10.1.2, p. 249 ("A consumer who fails to initiate the dispute with the CRA under section 1681i and instead deals directly with the furnisher, whether informally or formally through a furnisher direct dispute, cannot invoke any FCRA remedies whatsoever. *Private consumer enforcement is only available for a breach of the section 1681s-2(b) furnisher obligations triggered by a formal section 1681i(a) dispute with a CRA . . .*") (footnotes omitted) (emphasis added).

> b. FCRA narrative
>> i. *Duty of furnisher to provide accurate and complete information to CRA*

Furnishers of credit information (like ACS) have a duty to provide accurate and complete information to the CRAs in the first place pursuant to § 1681s-2a(1)(A). The prohibition on a furnisher's supplying information to a CRA it knows or has reasonable cause to believe is inaccurate is stated in § 1681s-2a(1)(A). Additionally, a furnisher who has been notified by the consumer that specific information is inaccurate, and that information, in fact, is inaccurate, may not then furnish that information to a CRA. <u>See</u> § 1681s-2(a)(1)(B).

10

If a CRA receives a dispute from a consumer, it must initiate a "reasonable investigation" which includes notifying the information's furnisher of the dispute within five (5) days of receiving the dispute, see § 1681i(a)(2)(A). The CRA must ascertain the accuracy of the disputed information, record the current status of the information or delete it from its file within thirty (30) days of notice of the dispute. There is *no private right of action* to remedy an alleged breach by the furnisher to provide correct and complete consumer credit information to a CRA under § 1681s-2(a). See § 1681s-2(c)(1). See, e.g., Longman v. Wachovia Bank, N.A., ___ F.3d ___, 2012 WL 6604538, slip op. at *3 (2d Cir. Dec. 19, 2012); SimmsParris v. Countrywide Fin. Corp., 652 F.3d 355, 358 (3d Cir. 2011) (no private right of action under § 1681s-2(a)); Saunders v. Branch Banking & Trust Co. of Va., 526 F.3d 143, 149 (4th Cir. 2008) (same).

ii. *Duty of furnisher to reinvestigate and correct following proper notice from CRA*

However, when it receives notice from a CRA of a dispute pursuant to § 1681i(a)(2)(A), a furnisher must initiate its own reinvestigation of the information, which must include investigating the disputed information, reviewing all relevant information provided by the CRA under § 1681i(a)(2), and reporting the results of the investigation to the reporting CRA; if information found to be inaccurate or incomplete or cannot be verified, (i) reporting results to all other CRAs to which the furnisher provided that information, and (ii) modifying, deleting or permanently blocking reporting of that information. See § 1681s-2(b)((1); see also Saunders, 526 F.3d at 148. This furnishers' duty to conduct a reinvestigation and make appropriate reports and corrections or deletions must be completed within thirty (30) days of receiving notice of the dispute from a CRA. See § 1681s-2(b)(2); see also Moore v. Equifax Information Servs., LLC, 333 F. Supp. 2d 1360, 1366 (N.D. Ga. 2004) (explaining that, upon notice of a dispute, furnishers

11

are required "to conduct to conduct an investigation with respect to the disputed information, review all relevant information provided by the consumer reporting agency, and report the results of the investigation to the consumer reporting agency.").

*A furnisher's duty to investigate does not arise for purposes of a consumer private right of action under § 1681s-2(b) unless and until a CRA notifies the furnisher of a dispute.* See Brown v. Wal-Mart Stores, Inc., No. 11-6049, 2012 WL 6051957, slip. op. at *4 (6th Cir. Dec. 6, 2012); Saunders, 526 F.3d at 150. Only after this notice requirement is met does a consumer plaintiff have standing to bring a claim under subsection (b) against a furnisher that failed after proper notice by the CRA to make a timely reinvestigation, report and correction. See, e.g., Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1147 (10th Cir. 2012); SimmsParris, 652 F.3d at 359 (3d Cir. 2011); Chiang v. Verizon New England Inc., 595 F.3d 26, 35 (1st Cir. 2010); Mazza v. Verizon Washington DC, Inc., 852 F. Supp. 2d 28, 35 (D.D.C. 2012); Ilodianya v. Capital One Bank USA, NA, 853 F. Supp. 2d 772, 774 (E.D. Ark. 2012); Sweitzer v. Am. Express Centurion Bank, 554 F. Supp. 2d 788, 795 (S.D. Ohio 2008) ("[A] § 1681s–2(b)(1) violation is triggered only upon a consumer reporting agency providing notice to the furnisher of information"); Stafford v. Cross Country Bank, 262 F. Supp. 2d 776, 784 (W.D. Ky. 2003) ("[A] furnisher of credit information, such as the Bank, has no responsibility to investigate a credit dispute until after it receives notice from a consumer reporting agency. Under the statutory language, notification from a consumer is not enough.").

It is only for a breach of this duty of reinvestigation and correction under § 1681s-2(b) that a consumer may bring a private civil lawsuit against a furnisher of information, pursuant to the FCRA. See, e.g., FAIR CREDIT REPORTING at § 6.10.1.1 & § 6.10.1.2, pp. 249. The legal theories

available for a private right of action by a consumer against a furnisher pursuant to § 1681s-2(b) are stated in § 1681n (negligent noncompliance) and/or § 1681o (willful noncompliance).

### iii. *Breach*

By definition, no breach can occur unless and until a person fails to comply – either negligently or intentionally – with a duty imposed on him. The burden to prove a breach of duty is on the party alleging it, who also must prove as an element of his claim that he suffered compensable injury proximately caused by the breach. These legal requirements are so fundamental as to require no citation.

Willful violations of the FCRA require proof that the furnisher knowingly and intentionally committed an act in conscious disregard for the rights of others, but a plaintiff need not show malice or evil motive. See § 1681n; see also, e.g., Bruce v. First U.S.A. Bank, Nat. Ass'n, 103 F. Supp. 2d 1135, 1144 (E.D. Mo. 2000) (citing Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir. 1998); Cushman v. TransUnion Corp., 115 F.3d 220, 226 (3d Cir. 1997) (a defendant's actions must be on the same order as willful concealments or misrepresentations to justify punitive damages)).

### 2. *The Parties' Basic Contentions*

The gravamen of the Mavillas' allegations in Count I is that ACS negligently and/or willfully furnished false information about them to CRAs and falsely verified a debt to the CRA(s), all resulting in actual and statutory damages, as well as punitive damages under the FCRA. In support of its motion for summary judgment as to that claim, ACS contends, first, that the Mavillas did not comply with statutory requirements that they first notify the CRAs of the disputed debt. Next, ACS points out that the Mavillas instituted this lawsuit against ACS before

13

it had time to conduct a reasonable investigation after receiving proper notice from a CRA.

Finally, ACS argues, the Mavillas have failed to demonstrate they suffered injuries as a

consequence of ACS's alleged non-compliance.

3. *The Mavillas' Evidence and Theory*

The several memoranda filed herein by plaintiffs' counsel contain various statements of

their theory of liability which is that ACS's mere reliance on WakeMed's computer-generated

referrals of unpaid debts for collection was unreasonable in the face of Mrs. Mavilla's repeated

denials that she received the underlying medical services. For example, after listing the duties of

furnishers set out in § 1681s-2(b)(1)(A), plaintiffs' counsel argues,

> ACS did none of these things, even though it is unreasonable to credit a bare
> invoice for obstetric services instead of a woman's statement that she had no
> children then, and even though any reasonable investigation would have shown
> Mrs. Mavilla's alleged debts to have been biologically impossible.

Plaintiffs' Response Memorandum [DE-64], p. 10 (citing "SUF 1-2, 14"); see also id. p. 5

("Failing or refusing to credit a woman's word as to when she did or did not bear children is

patently unreasonable."). With all due respect to the Mavillas, their lawyer's theory cannot trump

the specific requirements of federal debt collection law as applied to the facts that are established

by the competent documentary evidence of record.

4. *Analysis*

The court has conducted an extensive review of those documents of record, including

exhibits and deposition transcripts the parties have filed in support of their cross-motions for

summary judgment, together with exhibits the Mavillas filed herein early in the litigation when

they sought entry of default judgment. The court also has examined and reexamined the Mavillas'

pleadings and memoranda of record, and has taken care to compare these documents with the

14

matters of record appropriately considered under Federal Rule of Civil Procedure 56(e) and with the specifically applicable portions of the FCRA. Having done so, the court holds with confidence that the Mavillas have not carried their burden either to prevail on their Motion for Partial Summary Judgment [DE-58], or to resist ACS's Motion for Summary Judgment [DE-56].

### a. Unreasonable investigation

The short explanation is this: the record contains no documentation of if, when or how the Mavillas' provided notice to the CRA(s) to trigger the CRA(s)' notification to ACS on September 27, 2010, that the subject debts were disputed. Nevertheless, that ACS in fact received such CRA notice on that date is uncontested, and therefore establishes that ACS's duty to reinvestigate and correct under § 1681s-2(b) did not arise until **September 27, 2010.** By law, ACS had *thirty (30) days* after receiving notice of the dispute from a CRA within which to investigate and correct any incomplete or inaccurate information ACS had provided to the CRA(s). See, e.g., Sweitzer, 554 F. Supp. 2d at 795 ("[G]enerally, liability for a 15 U.S.C. § 1681s-2(b) violation arises 30 days after the furnisher of information does not comply with its obligations outlined in § 1681s2(b)(1)(A)-(D)") (citing 15 U.S.C. §§ 1681s–2(b)(2), 1681i(a)(1)-(2)). Thirty calendar days from September 27, 2010, was October 27, 2010.

Whether or not ACS breached a duty that arose on September 27th must be determined as of the date on which the Mavillas filed this lawsuit for damages allegedly resulting from that breach. The lawsuit was filed on Monday, October 4, 2010, see Complaint [DE-1], the fifth business day from the date on which ACS's duty arose. The court's task in ruling on the cross-motions for summary judgment as to Count I is to determine whether the Mavillas have demonstrated they have competent evidence by which they can prove each element of their *prima*

15

*facie* FDCA claim(s), including that ACS breached a duty after it arose, and by that breach, proximately caused compensable injury to the Mavillas.

As noted above, the Mavillas have demonstrated that ACS's duty to reinvestigate and correct had been triggered by the CRA's notice of dispute on September 27, 2010. In order to determine whether the Mavillas have forecast evidence sufficient to prove that ACS had breached that duty on or before Monday, October 4, 2010, the court has perused the record and the parties' memoranda carefully but has not located evidence, competent under Rule 56(e), to support a determination that the plaintiffs can demonstrate a breach by ACS between September 27, 2010, and October 4, 2010. Indeed, pursuant to the statutory scheme under which the Mavillas chose to sue, they instituted this lawsuit when ACS still had 23 days remaining before its 30-day reinvestigation and correction deadline expired. See § 1681s-2(b)(2).

Although the statute does not describe what would be a "reasonable investigation," the furnisher's burden is limited by what information is provided in the CRA's notice to it that there is a customer dispute. See § 1681s-(b)(1)(B),(C) (furnisher must review all relevant information *provided by the CRA pursuant to § 1681i(a)(2) notice*, then report the results to the CRA). The Mavillas have not identified the evidence by which they would demonstrate that the dispute Notice ACS received from the CRA included details of Mrs. Mavilla's physiological capacity to have received the services for which the debt allegedly was incurred. The record indicates that the CRA, through its E-OSCAR electronic notification system, simply alerted ACS that the reported delinquent debts were in dispute. *See* C. Mamfelt Dep. of March 13, 2012 [DE-57.C], p. 58, ll. 22-23, referencing entries in Exhibit 21 (designated by plaintiffs' counsel as ACS's "Collection

16

Notes") recording "Vickie Garrett – RECEIVED DISPUTE VERIFICATION FROM E-OSCAR; VERIFIED AS REPORTED; PAID."

Moreover, the evidence the Mavillas produced herein on its face demonstrates that their application to refinance their home and their application for a Kohl's credit card had been rejected *before* ACS's duty arose on September 27, 2010.[10] Therefore, the Mavillas cannot prove they suffered damages as a proximate result of a breach of duty that had not yet arisen. See, e.g., Ruffin-Thompkins v. Experian Info. Solutions, Inc., 422 F.3d 603, 608 (7th Cir. 2005) (stating that "[w]ithout a causal relation between the violation of the statute and a loss of credit, or some other harm, a plaintiff cannot obtain an award of actual damages"); Nagle v. Experian Info. Solutions, Inc., 297 F.3d 1305, 1307 (11th Cir. 2002) (holding that the failure of a plaintiff to produce evidence of damages resulting from an FCRA violation mandates summary judgment).

      b. False Verification

The Mavillas also contend they suffered damages by virtue of ACS "falsely verifying the tradelines." Again, evidence of record reflects that upon receipt of notification from the CRA(s) of the credit dispute, ACS on September 28, 2010, again contacted WakeMed to inquire about the validity of the debts and again was assured by WakeMed that the information provided was correct. ACS then reported back to the CRA(s) that the debt was valid. On several occasions, Christopher Mamfelt's confirmed that procedure during his two depositions. See, e.g., C. Mamfelt Dep. of June 14, 2012, [DE-57.D], p. 16 ("We would research it, contact the client, which we did in this case, and the client told us that the charged that were placed with us for Ms.

---

[10]    See Exh. 2 to Plaintiffs' Suppl. Memorandum to Motion for Default Judgment [DE-12] (JP Morgan Chase Bank denial letter bearing "Score Date of 09/22/2010"); see id., Exh. 1 (Kohl's rejection letter dated 09/21/2010, referencing Experian credit report).

17

Mavilla were her charges and we continued our collection activity."); C. Mamfelt Dep. of March 13, 2012, [DE-57.C], p. 34 ("Again, in this case and what I know of this case, we had two occasions where WakeMed confirmed that the charges were for Mrs. Mavilla, the placement of that account and the itemized bill for that account.").

It is the Mavillas' position, however, that in order to comply with the FCRA, ACS should have conducted a more thorough reinvestigation including, but not limited to, obtaining Mrs. Mavilla's medical records to render an independent determination of the physiological feasability that Mrs. Mavilla's explanation was true, such that the obstetrical bills could not have been incurred by her. Plaintiffs' counsel argued that, had ACS *really* made proper inquiry,

> WakeMed would also have told ACS that Mrs. Mavilla informed it in writing that she had her tubes tied in October 2001, inspiring doubt in any reasonable person. ACS could and should then have requested Mrs. Mavilla's actual medical records, not just the easily faked invoices, detailing the billed-for services and signed by the physical or other professional who provided care. ACS could and should also have credited Plaintiffs' entirely truthful denials of liability. This was not a credit card or furniture loan – this was alleged childbirth, which no woman would lie about.

Plaintiffs' Response [DE-64], p. 6. As noted above, the reasonableness of a reinvestigation by a furnisher is determined in light of "all relevant information *provided by*" the CRA under § 1681i(a)(2). *See supra*, page 16, citing § 1681s-2(b)(1)(B). The Mavillas have identified no evidence that the notifying CRA supplied any information other than what appeared in its electronic notification via E-OSCAR. Plaintiffs' counsel's suggestion that ACS should have examined a pathology report concerning Mrs. Mavilla's sterilization procedure in 2001,[11] see C.

---

[11] The Mavillas contend they forward copies of a 2001 pathology report to "both WakeMed and ACS on or about 21 July 2009 to let them know that she had been in another state in 2003 and sterile since 2001, and demanded that ACS cease communication." Plaintiffs' Memorandum in Support of Default Judgment [DE-11], p. 2. Attached to that Memorandum as Exhibit 1 is the "Pathology Report" from El Camino Hospital, Mountain View, California, and

18

Mamfelt Dep. of June 14, 2012 [DE-57.D], pp. 21-23, is unsupported by any source counsel has cited.

At bottom, however, whether or not ACS's reinvestigation was "reasonable" under the FCRA is not capable of proof, because the Mavillas filed this lawsuit more than twenty days before ACS was required by law to perform. In other words, the FCRA claim was filed prematurely, at best.

It is no secret that the perverse complexity of the FCRA defies facile comprehension or compliance by "mere consumers" – notwithstanding its declared purpose – and the Mavillas are not faulted for not having done so. It recently has been observed that,

> [i]n order to effectively keep a creditor from distributing inaccurate information, consumers must submit disputes not to the credit card companies and other creditors with which they regularly interact, but to credit reporting agencies—obscure third parties with which they are unlikely to be familiar. . . . [T]he FCRA places the burden of ensuring the efficient functioning of the credit reporting system on the consumers themselves – laypeople who are, in most cases, in no position to carry out that task by jumping over the technical hurdles created by the statute. Such a scheme is troubling, to say the least.

Burrell, 753 F. Supp. 2d at 445-46. Nevertheless, except for a provision enabling a CRA to terminate a reinvestigation that it determines is frivolous or irrelevant, see § 1681i(a)(3), and the "opportunity for the furnisher to save itself from liability by taking the steps required by § 1681s-

---

email correspondence between Mrs. Mavilla and plaintiffs' counsel on October 1, 2010, attaching an email she received from the North Carolina Department of Health & Human Services on August 28, 2009, stating "we could find nothing to connect you to any Medicaid coverage."

2(b), Congress put no limit on private enforcement under §§ 1681n and *o*." <u>Nelson v. Chase</u> <u>Manhattan Mortgage Corp.</u>, 282 F.3d 1057, 1060 (9th Cir. 2002).

The facts of this case are poignantly illustrative of the likely inability of most consumers to avoid inaccurate credit information from being reported to CRAs and from furnishers delaying correcting of such information once it is reported. Yet, this is the statutory scheme, procedure and detailed requirements enacted by Congress in full effect during the entire period relevant to this lawsuit which persists to this date. The court is not free to ignore the plain statutory requirements.

5. *Summary*

For the foregoing reasons, the court concludes that there are no genuine issues of material fact whether the Mavillas' purported damages are recoverable under the FCRA. See FED. R. CIV. P. 56(e); <u>Lujan</u>, 497 U.S. at 888-89 (nonmoving party must "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant). Rather, the record reveals no evidence that ACS breached any duty it owed to the Mavillas, and the evidence that does exist demonstrates that the Mavillas' loss of credit opportunities was not proximately caused by any post September 27, 2010, violation by ACS of the FCRA. Accordingly, ACS's Motion for Summary Judgment [DE-56] is ALLOWED as to Count One. The Mavillas' Motion for Partial Summary Judgment [DE-58] is DENIED as to Count One.

B. <u>Count II – Violations of N.C. Debt Collection Act, N.C. GEN. STAT. Ch. 75, Art. 2</u>

The Mavillas concede that ACS is exempt from the provisions of the NCDCA. Accordingly, ACS's Motion for Summary Judgment [DE-56] is ALLOWED as to Count Two.

C. Count IV – Violations of the Fair Debt Collection Procedures Act, 15 U.S.C. § 1692, *et seq.*

The Mavillas contend in Count IV that ACS violated the federal Fair Debt Collection Procedures Act ("FDCPA"), 15 U.S.C. 1692, *et seq.* Specifically, they contend that ACS violated §§ 1692e(2)(A), (5) and (10), and 1692f. According to the Complaint, the factual bases for these allegations are ACS's telephone calls and dunning letters directed to the Mavillas attempting to collect the subject WakeMed debts.

To prevail on a claim pursuant to the FDCPA, a plaintiff must allege and prove that (1) she was the object of collection activity arising from a consumer debt, as defined by the FDCPA; (2) the defendant is a debt collector as defined by the FDCPA; and (3) the defendant engaged in an act or omission prohibited by the FDCPA. See Johnson v. BAC Home Loans Servicing, LP, 867 F. Supp. 2d 766, 776 (E.D.N.C. 2011). At first glance, it seems Mrs. Mavilla would satisfy at least the first two elements, but in fact, it is her position that the sums ACS attempted to collect were not consumer debts at all, but were charges that WakeMed and/or ACS fabricated in an attempt to extort money from the Mavillas and/or to ruin their credit ratings.

Assuming, however, without so deciding, that the Mavillas could satisfy the first two elements, they have failed to forecast evidence by which they can prove the third. The acts ACS allegedly performed were placing telephone calls and sending letters to the Mavillas between April 2009 and August 2009, and ("falsely report[ing] both the $54 account and the $126 account as paid collection items on Mrs. Mavilla's consumer credit reports."). See Complaint at ¶¶ 13-15, 19, 22, 28-31.

21

The Mavillas' Response Memorandum [DE-64], lists half a dozen subsections of § 1692e they believe were violated by ACS, see id., pp. 16-17, but their Complaint alleges violations only of §§ 1692e(2)(A), (5) and (10), in addition to § 1692f. See Complaint [DE-1] ¶¶ 18, 21, 24, 33.

Subsection (2)(A) of § 1692e provides that a debt collector may not make a false representation of "the character, amount, or legal status of any debt." It appears to be the plaintiffs' position that "collecting a false debt is per se" violative of § 1692e(2)(A). Plaintiffs' Response [DE-64] p. 16. The Mavillas have not identified by what conduct or to whom ACS made a "false representation of the character, amount or legal status of any debt" in connection with the collection of any debt within the one-year statute of limitations applicable to § 1692e. To the extent the plaintiffs would rely on ACS's allegedly "falsely report[ing] both the $54 account and the $126 account as paid collection items on Mrs. Mavilla's consumer credit reports," it is uncontested that the Mavillas in fact *did* pay those bills in December 2009, as a result of ACS's collection efforts.

Subsection (5) of § 1692e provides that a debt collector may not threaten "to take any action that cannot legally be taken or that is not intended to be taken." The Mavillas allege in the Complaint that ACS violated subsection e(5) by threatening to bring civil lawsuits against them to collect the fake debt beyond expiration of the statute of limitations. See Complaint [DE-1] ¶ 16. However, Mrs. Mavilla admitted in her deposition that ACS did *not* threaten to file a lawsuit to collect the disputed debts, see P. Mavilla Dep. [DE-57.B] pp. 39-40. There are no threats of civil litigation contained in any correspondence from ACS that the plaintiffs have revealed in support of their position. Moreover, expiration of the statute of limitations to file a lawsuit to recover a debt does not prevent a collector from attempting to collect it by other lawful means.

22

Subsection e(10) prohibits a debt collector from using "any false representation or deceptive means to collect or attempt to collect any debt." It is not apparent from the Complaint or the Mavillas' memoranda exactly what conduct by which they intend to prove ACS violated subsection e(10), although they explain in their Memorandum filed in support of their Motion for Partial Summary Judgment [DE-59],

> [a]s already thrashed to death *supra*, ACS's conduct and communications were false and deceptive from the get-go, meriting maximum financial pain in return. No reasonable jury could award less then $1,000 on such evidence. Tragically, FDCPA's maximum statutory damage limit of $1,000 per plaintiff per defendant results in only another $2,000 for Plaintiffs.

Id. p. 16. Nevertheless, Mrs. Mavilla conceded during her deposition that, had ACS questioned WakeMed about the accuracy of the debts it referred for collection, ACS probably would have received the same response the Mavillas received from WakeMed – that the bills correctly were charged to the Mavillas, see P. Mavilla Dep. [DE-57.B], pp. 59-60.

The Mavillas also contend ACS violated § 1692f, which provides that a debt collector "may not use unfair or unconscionable means to collect or attempt to collect any debt." That section then provides a non-exhaustive list of specific conduct that would constitute a violation. While it is not apparent what acts by ACS the Mavillas intend to use to a prove ACS's violation of § 1692f, they state,

> ACS correctly observes that collecting time-barred debts is not on the specific list underneath, but incorrectly leaves out an important sentence in between. 'Without limiting the general application of the foregoing, the following conduct is a violation of this section . . .'. Congress really should correct the oversight, but no matter, collecting stale debt without full disclosure to the consumer is unconscionable.

Plaintiffs' Memorandum in Response [DE-64], p. 17.

While the court has found it impossible to determine from the Complaint or memoranda the specific factual bases upon which the Mavillas rely in alleging ACS violated the alleged subsections of § 1692, it is apparent that they rely heavily on the strict liability nature of the law, see Plaintiffs' Memorandum in Support [DE-59], p. 15-17 (quoting Warren v. Sessoms & Rogers, P.A., 676 F.3d 365, 375 (4th Cir. 2012)), in tandem with their position that ACS cannot prevail on its "bona fide error" affirmative defense.

The "bona fide error" defense is statutory. Section 1692k(c) provides that, "A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." The Mavillas contend that ACS has not produced any evidence that it acted without intending to cause them to pay a debt they had not, in fact, incurred. They argue that ACS has failed to produce any documents to prove that they maintained appropriate internal training procedures and failed to explain "which FDCPA provisions are taught in its alleged compliance program." Memorandum in Response [DE-59], p. 16.

The Mavillas fail to recognize that ACS's burden to demonstrate it can prove an affirmative defense does not arise unless or until they, as plaintiffs, demonstrate they can offer evidence constituting a *prima facie* FDCPA claim. It is not a violation of the FDCPA for a debt collector to seek payment of an alleged debt by making telephone calls and writing letters that do not violate the law. Indeed, the Mavillas did not allege that ACS violated § 1692e(8) ("causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number"). Nor is it a violation to

24

report a delinquent debt to a CRA in compliance with applicable laws and regulations, and the court has determined, above, that the plaintiffs have not carried their burden under Rule 56 to survive ACS's motion for summary judgment.

The court's careful scrutiny of the Complaint, together with the deposition transcripts of record, memoranda and supporting exhibits, has failed to discover any evidence identified by the Mavillas of actionable conduct by ACS under the FDCPA. Although plaintiffs' counsel makes scathing accusations and sweeping proclamations of "corporate hooliganism" against ACS, the actual evidence plaintiffs have produced demonstrates simply that ACS representatives repeatedly called the Mavillas and continued to do so despite the Mavillas' verbal protestations that the debts were not theirs, and that ACS directed two sets of "dunning" letters to the Mavillas seeking, with escalating insistence, that they pay the "fabricated" WakeMed bills, until the Mavillas issued a written cease and desist demand on August 24, 2009. After that date, the only written communication ACS directed to the Mavillas was its letter in November 2009, notifying them that it had reported the alleged delinquent debts to the CRA(s).[12] See Complaint at ¶ 26, 29. There being an insufficient showing by the plaintiffs that they can produce evidence constituting a prima facie case under the FDCPA, ACS has no obligation to forecast evidence of an affirmative defense thereto. Accordingly, ACS's Motion for Summary Judgment [DE-56] is ALLOWED as to Count IV.

---

[12]    At this point, the Mavillas could have notified ACS that they disputed the accuracy or completeness of the negative information it reported to the CRAs, which notification would have prevented ACS from further reporting that information to a CRA without noting that the information was disputed. See 15 U.S.C. § 1681s-2(a)(3). Instead, the Mavillas paid two of the three alleged debts.

D. Count III – <u>Violations of N.C. Collection Agencies Act, N.C. Gen. Stat. Ch. 58. Art. 70</u>

The Mavillas seek in Count III to collect damages pursuant to North Carolina's Collection Agencies Act ("NCCAA"). They specifically cite N.C. Gen. Stat. §§ 58-70-95(3), 58-70-110(4), and 58-70-115(1), which they claim entitle them to statutory damages under § 58-70-130 per violation. This claim is supplemental to the federal claims that conferred original federal jurisdiction in this court, and all such federal claims have been dismissed. Accordingly, the court declines to exercise supplemental jurisdiction over the Mavillas' supplemental NCCAA claim. <u>See</u> 28 U.S.C. § 1367(a), (c), and Count III therefore is DISMISSED. ACS's Motion for Summary Judgment [DE-56] as to Count III is DENIED as moot.

E. Count IV – <u>Declaratory Judgment</u>

In another federal civil action in this district court prosecuted by the same attorney who represents the Mavillas here, Chief Judge James C. Dever, III, wrote, "[plaintiff's] claim for declaratory relief must be dismissed. The relief he requests is not the type of action contemplated by the Declaratory Judgment Act." <u>Edwards v. Santander Consumer USA, Inc.</u>, No. 5:10-CV-424-D, 2011 WL 2457498, slip op. at *6 (E.D.N.C. June 15, 2011). In the <u>Edwards</u> case, prior litigation conclusively had established that the plaintiff did not owe the subject debt. <u>See id.</u>

Here, it has been uncontested since near the date the Complaint was filed that the WakeMed billing had been a mistake and that the plaintiffs owed neither WakeMed nor ACS any money thereon. "Therefore, a declaratory judgment from this court would not provide certainty, security, or alleviate controversy." <u>Id.</u>, citing <u>United Capitol Ins. Co. v. Kapiloff</u>, 155 F.3d 488, 493 (4th Cir. 1998). Indeed, the Declaratory Judgment Act confers discretion on the district court, *"[i]n a case of actual controversy . . .* [to] declare the rights and other legal relations of any

interested party seeking such declaration, whether or not further relief is or could be sought." Id.,

citing 28 U.S.C. § 2201 (emphasis added).

> In determining whether an actual controversy exists, the basic inquiry is whether
> the conflicting contentions of the parties present a real, substantial controversy
> between parties having adverse legal interests, with a definite and concrete dispute,
> and not one which is hypothetical or abstract. Babbitt v. United Farm Workers
> Nat'l Union, 442 U.S. 289, 298 (1979). Declaratory relief may not be granted on a
> moot claim. Nestler v. Bd. of Law Exam'rs of the State of N.C., 611 F.2d 1380,
> 1382 (4th Cir. 1980). Only in exceptional circumstances will a court hear a claim
> that is "capable of repetition, yet evading review." Los Angeles v. Lyons, 461 U.S.
> 95, 109 (1983). The availability of future damages actions precludes a finding that
> such exceptional circumstances exists. See Alvarez v. Smith, [558 U.S. 87, ___],
> 130 S. Ct. 576, 581 (2009).

Edwards, supra, slip op. at *5. Here, as in Edwards, dismissal is appropriate because "the matter

[that Mrs. Mavilla does not owe ACS any money] is not in controversy." Id.; see also C. Mamfelt

Dep. of March 13, 2012 [DE-57.C], p. 89, ll. 12-17:

> MR. PARTRICK (ACS's counsel): Right. We expect those [answers to requests
> for admission] to be revised, but I'll just state right here that they're going to – 37,
> "Plaintiff owes you nothing," will be revised to say, "Admitted"; 38, "Plaintiffs
> owe nothing to any of your clients"; response, "Denied" will be revised to say,
> "Admitted."

Accordingly, the court declines to exercise its discretion under the Declaratory Judgment Act, and

ALLOWS ACS's Motion for Summary Judgment [DE-56] as to Count V.

## III. Conclusion

For the reasons exhaustively set forth herein, ACS's Motion for Summary Judgment [DE-

56] is ALLOWED. The Mavillas' Motion for Partial Summary Judgment [DE-58] is DENIED.

The Clerk of Court is DIRECTED to enter judgment accordingly.

SO ORDERED. This, the 10th day of January, 2013.

*James C. Fox*

JAMES C. FOX
Senior United States District Judge

27

Case 5:10-cv-00412-F   Document 82   Filed 01/10/13   Page 27 of 27